AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUL 29 2015

MATTHEW J. DYKMAN
CLERK

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 15mr471
Data contained in the email account )
TURQUOISEMAN@YAHOO.COM as described in )
Attachment A, maintained by Yahoo, Inc. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated herein.

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C, 1341, 1343, 1956 and 1957 | Mail Fraud, Wire Fraud, Money Laundering and Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity |

The application is based on these facts:

See Affidavit, attached hereto and incorporated herein

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

David J. Backlund, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/29/15

_____
*Judge's signature*

City and state: Albuquerque, NM

_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, David J. Backlund, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Yahoo, Inc (Yahoo), which, among other things, is an e-mail provider headquartered at 701 First Avenue, Sunnyvale, California 94089. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been employed in this capacity for over six years. Prior to the FBI, I was employed as a Special Agent of the Air Force Office of Special Investigations (AFOSI) for over seven years. I am currently assigned to the Albuquerque Division of the FBI, White Collar Crime Squad, where I investigate federal financial crimes. Throughout my career as a Special Agent I have conducted multiple investigations involving various financial crimes to include investigations involving wire fraud, mail fraud and money laundering.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Since April 2015, myself and fellow FBI Agents have been investigating what appears to be a fraudulent financial scheme advanced and promoted by Jack Elkins, who resides, and conducts a jewelry related business in Prewitt, New Mexico. As more fully described throughout this affidavit, I believe there is probable cause that Elkins knowingly sells imitation turquoise to other persons in the jewelry business for large sums of money knowing full well that the turquoise he claims to be of very high quality is, instead, not turquoise at all. Instead, through my investigation I have learned the substance sold by Elkins as turquoise is not even a stone, but is unnatural, manufactured product of little to no value in the turquoise jewelry business. It is not natural turquoise. The investigation, so far,

indicates that Elkins has unlawfully misappropriated approximately $1.7 million from three unwitting customers to whom he sold the fake turquoise. One customer, Frank Amini, is from New Mexico, while Said Sekandari is from Arizona; and Abdul Meskienyar is from California.

5. Based on my training and experience and the facts as set forth in this affidavit, I submit probable cause exists that violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1956 (Money Laundering), and 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), have been committed by Elkins, and possibly others known and unknown to me, resulting in substantial financial losses to at least three victims of the fraudulent conduct described below. I submit probable cause also exists to search the location described in Attachment A, for evidence, instrumentalities, or fruits of these crimes as described in Attachment B.

## JURISDICTION

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. In late April 2015, the Albuquerque Division of the FBI opened an investigation after receiving an allegation from Frank Amini that Elkins sold fake turquoise chalk to multiple individuals.

### Victims

### Frank Amini

8. On April 16, 2015, Frank Amini was interviewed by FBI agents. Amini explained to the agents that he is a stone dealer and jeweler by profession in New Mexico. In July or early August 2014, Amini met with Elkin's at Elkin's property, located at 1041 Haystack Place, Prewitt, New Mexico. Elkins was very experienced in the turquoise business and had provided stabilization services in the past. Turquoise chalk is a low-quality variety, found deeper in the soil. As a result, it is soft and brittle and must me "stabilized" with other materials before it can be used to create jewelry. Elkins showed Amini what Elkins claimed was approximately $60,000 worth of turquoise chalk that appeared

2

to be of very high quality. Elkins told Amini he would sell the chalk to Amini exclusively on the condition that Amini pay in cash, and kept their business dealings confidential.

9. Amini agreed and purchased approximately 600 pounds for $60,000 in cash. Amini explained that Elkins claimed he was not able to provide a certificate of authenticity at that time, but promised to provide one at a later date. Amini needed the certificate to prove that the chalk was natural turquoise and not imitation because Amini would be selling it to his buyers overseas. A couple of weeks later Elkins informed Amini he had more turquoise chalk to sell. Amini expressed interest, and they arranged for a second meeting. At their second meeting Elkins provided Amini with what appeared to be a certificate of authenticity from the supplier and provided Amini with a five kilogram sample of finished chalk. Amini sent the finished sample via Federal Express to a buyer named Ng LNU who represented Lok To Gems and Jewelry in Hong Kong who, Amini explained, "loved" the finished chalk and paid Amini $40,000 as a security deposit on an agreement that Amini would only sell his turquoise to Lok To Gems and Jewelry.

10. After Amini committed to providing turquoise to Lok To Gems and Jewelry, Elkins informed Amini that he was having legal trouble and had to turn over business operations to his employee, Jasper Mace, and his son, Colby Elkins.

11. In late August 2014, Mace called Amini and claimed that the turquoise mine in Mexico collapsed. Amini immediately contacted an Elkin's business colleague, Frank Lente who confirmed that the Mexican mine collapsed and offered to sell turquoise to Amini. Amini bought three batches of turquoise and made payments in the form of cashier's checks written out to Blue Stone, Inc. He later discovered Blue Stone Inc. was a business registered by Elkins. The chalk was stabilized by Mace who still worked on the property.

12. Near the end of September 2014, Amini sent the first batch of 600 lbs of turquoise chalk via Federal Express to Lok To Gems and Jewelry in Hong Kong and traveled there personally. While in Hong Kong, Amini received a call from Mace who informed him he was again able to supply turquoise from the mine in Mexico that had collapsed. Elkins told Amini, he arranged a deal where Elkins' brother, Jerry Elkins, would loan Amini $185,000 for the transaction because Amini could not immediately come up with the funds. Amini borrowed $200,000 from his brother Ali Amini to pay back Jerry Ekins and to purchase turquoise additional chalk to be sent to Hong Kong. Eventually

Amini gave an envelope of cash to Mace that Mace was to deliver to Elkins to pay back Jerry Elkins. In retrospect, Amini is suspicious as to whether or not the Jerry Elkins' loan ever really existed.

13. Amini purchased a total of approximately 3,000 pounds of what he believed to be authentic turquoise chalk for his good faith payments totaling approximately $1.1 million. Unfortunately for Amini, before he received any payments himself, Lok To Gems and Jewelry informed him that the turquoise chalk he secured from Elkins was not authentic. In reliance on these testing results, Amini attempted to call Elkins as well Mace and Lente to try to recover his money and put a stop to Elkins now obvious scheme to defraud him and others of large sums of money for phony turquoise chalk. Indeed, he soon learned that Elkins also sold fake turquoise to at least two other merchants, including Abdul Meskienyar, of California for $400,000, and Said Sekandari, who is from Arizona, for $250,000.

14. Though Elkins became evasive at this point, Amini was able to confront him in a direct conversation, which he recorded and which I have reviewed. In these conversations, Elkins claimed he didn't have any of the money Amini paid Elkins for the fake turquoise chalk, because, he claimed, it was all used to purchase the turquoise chalk in Mexico that was sold to Amini. Elkins told Amini that as far as he knew, the chalk was turquoise. Elkins told Amini that he had it tested at multiple laboratories and that they all said it was natural turquoise.

### Said Sekandari

15. On June 2, 2015, Said Sekandari was interviewed by FBI agents. Sekandari owned Spirit Stone, an Arizona business that sells gemstones and jewelry. Sekandari met Elkins in approximately 2007 or 2008. Over the years, Elkins stabilized turquoise for Sekandari at Elkins' stabilization facility located on his property in Prewitt, New Mexico.

16. In approximately September 2014, Elkins called Sekandari and told Sekandari he had exclusive rights to turquoise chalk from a mine in Mexico. Elkins told Sekandari the turquoise was of high quality, describing it as "one of a kind." Sekandari asked for Elkins' mine contact. Elkins stated his contact was a Mexican national named Lupe LNU, who he claimed lived in Mexico. Sekandari called Lupe, who stated she represented the Mexican mine and that she was at that time in Mexico. Sekandari asked to meet with Lupe, stating they lived relatively close to each other since Lupe told him she lived just south of the Arizona-Mexico border. Lupe refused to meet with Sekandari. She told

Sekandari that she would only deal with Elkins and that Sekandari should travel to New Mexico to meet with Elkins.

17. In early October 2014, Sekandari traveled to Elkins' ranch in Prewitt, New Mexico with his brother-in-law, where they met with Elkins. Elkins showed Sekandari what Elkins claimed to be the pure turquoise chalk from the Mexican mine. Sekandari explained that the chalk did indeed look to be of extremely high quality. Sekandari agreed to purchase 530 pounds of the chalk for $130 per pound. In total, Sekandari agreed to purchase approximately $59,000 worth of chalk. Sekandari wanted to pay by check. But Elkins told Sekandari that Lupe would only accept cash. Sekandari paid in cash and left the chalk at Elkin's facility to be stabilized. Sekandari used Elkins to stabilize turquoise chalk in the past.

18. On November 14, 2014, Elkins personally delivered the chalk to Sekandari in Arizona. Elkins delivered the chalk in a motor home. Elkins again claimed the turquoise chalk was of a very high quality, calling it "one of a kind."

19. As a result of the "high quality", Sekandari agreed to purchase an additional 635 pounds of the chalk at $150 per pound for a total of approximately $95,000. Sekandari borrowed approximately $50,000 from his friend, Ismail Momeni and another approximately $45,000 from his friend, Tamin Doose. Sekandari gave the money to Elkins in late 2014. Mace was present when Sekandari gave Elkins the money.

20. After receiving the first order from Elkins, Sekandari was "a little" concerned regarding the quality of the turquoise chalk after it was stabilized. Sekandari stated the quality still appeared to be good but he expected better, but still made the second purchase notwithstanding his concerns. However, Sekandari did decide to send a sample to Guild Laboratories in California to be analyzed.

21. While waiting to receive the laboratory report, Sekandari made a trip to Prewitt, New Mexico to pick up the second turquoise chalk order he left with Elkins in order to be stabilized, but Elkins was not at the Prewitt facility; Mace told Sekandari that Elkins was unavailable.

22. After returning to Arizona, Sekandari received the laboratory report. Sekandari stated the laboratory report revealed that there were no turquoise properties in the representative sample Sekandari sent for analysis. After reviewing the report's analysis, Sekandari confronted Mace at Elkin's Prewitt facility, but Mace claimed a certificate confirms the chalk was pure turquoise, notwithstanding the test results secured by Sekandari. Mace gave Sekandari a copy of the certificate.

Mace told Sekandari that Elkins had the chalk tested himself, and that Elkins provided a copy of the certificate to Mace.

23. In late 2014, Sekandari confronted Elkins over the phone who insisted the chalk was legitimate high quality turquoise. Sekandari told Elkins that his laboratory test revealed that the chalk contained no turquoise properties at all. Still, Elkins again insisted the chalk contained natural turquoise as he previously claimed. Elkins told Sekandari he could bring a buyer to a gem show in Tucson in February 2015, who would purchase Sekandari's inventory. Elkins never produced a buyer and Elkins stopped taking Sekandari's calls.

24. In all, Sekandari was defrauded of as much as $190,000, from both the purchase of the fake turquoise chalk and the agreement to stabilize the chalk for Sekandari.

### Abdul Meskienyar

25. On June 8, 2015, Abdul Meskienyar was interviewed. Meskienyar explained that he owns and operates Mecca Gems & Jewelry out of San Francisco, California. Meskienyar is involved in the sale of turquoise. In approximately 2012, Meskienyar was introduced to Elkins. Soon after they met, Meskienyar had Elkins stabilize some of his turquoise. Elkins did a good job, so Meskienyar had Elkins stabilize his turquoise from that point on. In early 2014, Elkins began to tell Meskienyar that he had access to "high quality" turquoise chalk out of South America, as opposed to a mine in Mexico as he had claimed with the other two turquoise buyers referenced above. In August 2014, Elkins called Meskienyar and told him that Elkins had some of the high quality South American turquoise chalk, and Meskienyar "needed to see it" because it was so good.

26. On August 11, 2014, Meskienyar traveled to Elkins' property in Prewitt, New Mexico to meet personally with Elkins. When they arrived, Elkins introduced Meskienyar to a woman named Michelle Rodriguez, who he claimed to be a Mexican national who represented the turquoise mine in South America. Elkins told Meskienyar the chalk was pure turquoise and he would "bet my life on it." Elkins showed Meskienyar a certificate, supposedly from the Gemological Institute of America (GIA) that stated the chalk was natural turquoise.

27. As explained to agents by Meskienyar, during this meeting, it appeared that Elkins was in charge and that the chalk belonged to him. Both Elkins and Rodriguez both kept seemingly fluctuating between who actually owned the chalk. Meskienyar believed that for some reason, Elkins

wanted it to appear that Rodriguez owned the chalk. Elkins told Meskienyar there were multiple buyers interested in buying the chalk. Elkins and Rodriguez told Meskienyar that they exclusively wanted to deal with Meskienyar, notwithstanding the fact that Elkins eventually dealt with at least Sekandari and Amini. Although Elkins was acting strange, Meskienyar trusted him because they had done business in the past. Elkins also showed Meskienyar a sample of the chalk that Elkins claimed was already stabilized. Meskienyar stated to agents that the chalk appeared "magnificent".

28. As a result of the meeting and his personal assessment of the chalk, Meskienyar agreed to purchase 1,244.8 pounds for $93,360 in cash, and additional funds in the form of a check. Meskienyar did not remember the face value of the check. Meskienyar believed Elkins had Meskienyar write the check to an account in Elkins' wife's name. Meskienyar left the chalk with Elkins to be stabilized, just like Sekandari and Amini did with the chalk they purchased.

29. In September 2014, Meskienyar called Elkins and told him he needed to send some of his order to Hong Kong after it was stabilized. On September 20, 2014, Meskienyar again drove to Elkins' Prewitt facility to purchase more of what he believed to be high quality turquoise chalk. While there he picked up one pale of the stabilized chalk that he shipped to a jewelry business called Yee On Gems, located in Honk Kong, via UTi Worldwide, a supply chain management company based in Baltimore, Maryland.

30. Further, when Meskienyar arrived at Elkins facility in Prewitt, on September 20, 2014, he was met by Mace instead of Elkins. Mace told Meskienyar that Elkins was having legal problems so he could not make the meeting. Meskienyar had already made another deal to purchase another 1,264.8 pounds of the chalk for $88,392. Meskienyar gave the cash to Mace who was to deliver it to Elkins.

31. In late October 2014, Elkins called Meskienyar and told him that he received another shipment from the "South American" turquoise mine. This time, however, Elkins told Meskienyar that the mine was actually in Mexico. And, notwithstanding any prior discussions or agreements, Elkins told Meskienyar that the price would now be double. Elkins told Meskienyar that the mine collapsed, two workers were killed, and that all mining had ceased. Meskienyar agreed to the price, and purchased 1,318.4 pounds of the chalk. He paid $108,000 in cash and wrote a check for $15,000. Elkins told Meskienyar he needed Meskienyar to write the check to a new account that belonged to one of Elkins' employees.

32. Shortly after that transaction, a representative of Yee On Gems contacted Meskienyar and informed him that their laboratory tested a sample of the chalk and, consistent with the prior tests reported above, the chalk was found to have no turquoise properties. As a result, Meskienyar sent a sample of the chalk to a GIA laboratory in San Francisco. That laboratory determined that the sample contained no turquoise properties. The laboratory stated the sample had no phosphorous or copper and that it was not even a stone. The laboratory determined that the sample was completely manufactured.

33. Meskienyar drove to New Mexico and confronted Elkins. Meskienyar told Elkins of the laboratory results. Meskienyar directly accused Elkins of selling fake turquoise chalk. Notwithstanding the forensic evidence to the contrary, Elkins insisted that the chalk was natural turquoise as advertised by him and his associates. Elkins stated he also had a GIA laboratory report from a lab in New Mexico verify that the chalk was natural. Elkins told Meskienyar that he would take back the chalk and sell it for Meskienyar. Elkins also refunded approximately $30,000 to Meskienyar. Elkins promised to sell the chalk at a gem show in Tuscon, Arizona in February 2015. This never occurred in spite of his promise to Meskienyar.

34. After the February 2015 meeting, Meskienyar had a series of conversations with Elkins and Mace where they continued to insist the chalk was natural turquoise. In all, Meskienyar estimated he lost approximately $400,000 to Elkins' scheme to sell fake turquoise to him and others.

### Witnesses

35. On May 5, 2015, Mace was interviewed by FBI agents. Mace explained that in approximately August 2014, he entered into a business agreement with Elkins concerning the purchase and stabilization of turquoise. Elkins told Mace he needed Mace to take over the stabilization business because Elkins was involved in a civil action and he did not want to be associated with ongoing turquoise business matters as a result.

36. Elkins told Mace he received turquoise chalk from a mine in Mexico. Elkins provided contact information for a Michelle LNU and Lupe LNU. Elkins stated Michelle and Lupe were his contacts with the Mexican mine and they were Mexican nationals. The plan called for buyers to provide the money to Mace, who would provide it to Elkins, Michelle or Lupe. The turquoise chalk was then supposed to be delivered to Elkins' ranch outside Prewitt, New Mexico to be stabilized. Mace was never supposed to receive direct payment, in any kind of salary or wage for his role in the sale of the chalk. Instead, Mace and Elkins agreed that Mace would be paid $2.50 to $4.00 per pound to

stabilize the turquoise while Elkins would keep the remainder of the stabilization fees to cover chemical and facility costs.

37.     Elkins introduced Mace to Amini and his business partner, Shafi Naseri, as well as Sekandari and Meskienyar as buyers for the turquoise chalk. Once agreements were made and money was paid to Mace, on most occasions, Mace would deliver the money directly to Elkins. On a few occasions, he gave the money to Lupe.

38.     In August 2014, Amini and Naseri purchased 600 pounds of turquoise chalk for $100 per pound for a total cost of $60,000. Mace was not present for this transaction but he discussed it with Amini and Elkins and the 600 pounds of turquoise chalk was delivered to Elkins' ranch for stabilization.

39.     On or about September 11, 2014, Amini purchased 880 pounds of turquoise chalk at $100 per pound for a total of $88,000. The turquoise chalk was delivered to Elkins' ranch for stabilization by Mace.

40.     On or about September 19, 2014, Amini purchased 950 pounds of turquoise chalk for $100 per pound for a total of $95,000. The turquoise chalk was delivered to Elkins' ranch for stabilization by Mace.

41.     On an unknown date after the above transactions, Amini purchased 630 pounds of already stabilized turquoise chalk at $150 per pound for a total cost of $90,450. On this occasion the turquoise chalk was already at Elkins' ranch and Elkins told Mace the ownership of the chalk changed hands to Amini. On this occasion, Mace did not handle any money; he was only responsible for the stabilization.

42.     On or about October 20, 2014, Amini purchased 210 pounds of turquoise chalk at $100 per pound for a total cost of $21,000. The turquoise chalk was delivered to Elkins' ranch for stabilization.

43.     On or about October 25, 2014, Amini purchased 1127 pounds of already stabilized turquoise chalk at $150 per pound for a total cost of $165,000. On this occasion the turquoise chalk was already at Elkins' ranch and Elkins told Mace the ownership of the chalk changed hands to Amini. On this occasion, Mace did not handle any money; he was only responsible for the stabilization.

44.     On or about November 10, 2014, Amini purchased 1160 of turquoise chalk at $130 per pound for a total cost of $150,800. The turquoise chalk was delivered to Elkins' ranch for stabilization.

45. On or about November 12, 2014, Amini purchased 957 pounds of turquoise chalk at $80 per pound and 1298 pounds at $30 per pound for a total cost of $85,500. On this transaction, the turquoise chalk was provided by Elkins himself. It was allegedly already at his ranch to be stabilized. Amini paid Elkins directly. Mace remembered that Amini gave Elkins a check related to this transaction that bounced so Amini "made a deposit" into Elkins' bank account for $50,000.

46. On or about January 12, 2015, after Amini told Mace the chalk was not turquoise, Mace confronted Elkins about the fake turquoise chalk. Mace asked "what are you doing?" Elkins replied "I'm making money." Elkins laughed at Mace and told Mace that he was the "fall guy" because Mace's name was on all the receipts. Mace stated Elkins admitted that the turquoise chalk was fake, and Elkins fired Mace.

47. Mace stated Elkins had multiple large safes in his home that Mace helped to install at the Prewitt facility. In late 2014 or early 2015, Mace noticed stacks of cash that filled the safes. Elkins purchased at least three aircrafts in 2014/2015. Elkins also purchased a semi-truck and a camper in 2015. Mace believed Elkins also purchased a home in his son's, Colby Elkins', name, in November 2014, also located in Prewitt, New Mexico. Mace did not know the source of the funds for these purchases.

### Use of turquoiseman@yahoo.com

48. On June 24, 2015, a review of the trademark website www.markhound.com indicated Elkins filed for a trademark on "Sleeping Beauty Turquoise" In January 2013. The site listed Elkins' e-mail address as turquoiseman@yahoo.com. The site listed "precious and semi-precious minerals" as the service and/or goods Elkins provided.

49. On July 7, 2015, Meskienyar provided a series of e-mails that he sent to turquoiseman@yahoo.com regarding the purchasing and stabilization of the chalk. Meskienyar stated Elkins gave Meskienyar the e-mail address turquoiseman@yahoo.com as a way to contact Elkins. Elkins told Meskienyar the e-mail address belonged to him and that he used the e-mail address to conduct turquoise business and that Mace would be monitoring it.

### BACKGROUND CONCERNING E-MAIL

50. In my training and experience, I have learned that Yahoo provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Yahoo allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with Yahoo. During the registration process, Yahoo asks subscribers to provide basic personal information. Therefore, the computers of Yahoo are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Yahoo subscribers) and information concerning subscribers and their use of Yahoo services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

51. In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

52. In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

11

53. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

54. As explained herein, information stored in connection with an e-mail account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an e-mail account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the e-mail provider can show how and when the account was accessed or used. For example, as described below, e-mail providers typically log the Internet Protocol (IP) addresses from which users access the e-mail account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the e-mail account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail). Last, stored electronic data may provide relevant insight into the e-mail account owner's state of mind as it relates to the offense under investigation. For example, information in the e-mail account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

55. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

David J. Backlund
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on  July 29 , 2015

The Honorable William P. Lynch
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with turquoiseman@yahoo.com that is stored at premises controlled by Yahoo, a company that accepts service of legal process at 701 First Avenue, Sunnyvale, California 94089, or via electronic service at lawenforcement-request-delivery@yahoo-inc.com.

## ATTACHMENT B

### Particular Things to be Seized

I. **Information to be disclosed by Yahoo (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, the Provider is required to disclose the following information to the government for the account identified in Attachment A:

a. The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c. The types of service utilized;

d. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

II. **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1341 Mail Fraud, 18 U.S.C. § 1343 Wire Fraud, 18 U.S.C. § 1956 Money Laundering and 18 U.S.C. § 1957 Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, those violations involving Jack Elkins and others yet unnamed, including, for the account identified in Attachment A, information pertaining to the following matters:

(a) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(b) The identity of the person(s) who communicated with the user ID about matters relating to the business dealings Jack Elkins and the sale and stabilization of purported turquoise materials, including records that help reveal their whereabouts.

(c) All communications to and from turquoiseman@yahoo.com including e-mail attachments related to Jack Elkins' involvement in the sale and stabilization of purported turquoise materials.

(d) All communications including e-mail attachments to and from Jasper Mace, Frank Amini, Said Sekandari, Michelle Rodriguez, Frank Lente and Bluestone Inc.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Yahoo, Inc, and my official title is _____. I am a custodian of records for Yahoo, Inc. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Yahoo, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business activity of Yahoo; and

    c.    such records were made by Yahoo, Inc as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____
Date    Signature

3